**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| DORAIN MCCOWIN, | Case No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| BLUE TEAL HOLDINGS, LLC, | |
| Defendant. | |

Plaintiff Dorain McCowin ("Plaintiff") bring this Class Action Complaint against Blue Teal Holdings, LLC ("Blue Teal" or "Defendant"), individually and on behalf of all others similarly situated ("Class Members"), and allege, upon personal knowledge as to their own actions and their counsels' investigations, and upon information and belief as to all other matters, as follows:

**INTRODUCTION**

1.      This class action arises from a security breach, which allowed cybercriminals to access Defendant's computer network, exfiltrate files containing the personally identifiable information ("PII" or "Private Information") of tens of thousands, if not more, individuals (the "Data Breach"). As a direct result, Plaintiff and Class Members have suffered damages, including the imminent, ongoing threat of further harm from the criminal misuse of their stolen Private Information. Defendant is a commercial holding company with interests in various gas and oil companies operating in the state of Texas.

2.      Upon information and belief, on or around October 13, 2025, Defendant experienced a data breach whereby unauthorized cybercriminals accessed its information systems and databases and stole Private Information belonging to Plaintiff and Class members (the "Data Breach"). Subsequent investigations determined that unauthorized actors accessed and acquired

files containing the following categories of sensitive personally identifying information: names and Social Security numbers ("PII" or "Private Information").[1]

3.      The forensic investigation confirmed that the unauthorized actor successfully exfiltrated Private Information from Defendant's systems. The compromised data includes: Names of individual; Social Security Number Information; Driver's License number; Government-issued ID number (e.g. passport, state ID card); and Financial Information (e.g. account number, credit or debit card number).[2]

4.      Because Defendant stored and handled Plaintiff's and Class members' highly sensitive Private Information, it had a duty and obligation to safeguard this information and prevent unauthorized third parties from accessing this data.

5.      Ultimately, Defendant failed to fulfill this obligation, as unauthorized cybercriminals breached its information systems and databases and stole vast quantities of Private Information belonging to Plaintiff and Class members. The Data Breach—and the successful exfiltration of Private Information—were the direct, proximate, and foreseeable results of multiple failings on the part of Defendant.

6.      The Data Breach occurred because Defendant failed to implement reasonable security protections to safeguard its information systems and databases. Moreover, before the Data Breach occurred, Defendant failed to inform the public that its data security practices were deficient and inadequate. Had Plaintiff and Class members been made aware of this fact, they would have never provided such information to Defendant.

---

[1] *See* Plaintiff's Notice Letter, attached as ***Exhibit A***.
[2] *Id.*; *see also Data Security Breach Reports*, TEX. ATT'Y GEN., https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited June 1, 2026). As Defendant's notice indicates, the compromised data varies by individual but includes various iterations of the data listed herein.

7.      Defendant's subsequent handling of the breach was also deficient. Defendant unreasonably delayed in informing victims of the Data Breach.

8.      Accordingly, Plaintiff brings this action on behalf of all those similarly situated to seek relief for the consequences of Defendant's failure to reasonably safeguard Plaintiff's and Class members' Private Information; its failure to reasonably provide timely notification to Plaintiff and Class members that their Private Information had been compromised; and for Defendant's failure to inform Plaintiff and Class members concerning the status, safety, location, access, and protection of their Private Information.

9.      The fact that an unauthorized actor removed the Private Information, as Defendant's notice strongly suggest, means that the data was not merely accessed or viewed but was affirmatively exfiltrated from Defendant's systems. This exfiltration dramatically increases the risk that the data has been, or will be, sold, published, or used for identity theft, medical fraud, insurance fraud, phishing, social engineering, and other malicious purposes. Once removed from by an unauthorized actor, there is no mechanism to retrieve, recall, or "un-steal" the data.

10.     Despite the highly sensitive nature of the Private Information it collected, maintained, and stored, and despite its obligations under federal and state law, Defendant failed to implement and maintain reasonable and adequate data security measures sufficient to protect Plaintiff's and Class Members' Private Information from the foreseeable risk of unauthorized access and exfiltration.

11.     As a result of Defendant's negligent, reckless, intentional, and/or unconscionable failure to adequately satisfy its contractual, statutory, and common-law obligations, Plaintiff and Class members suffered injuries, but not limited to:

     a. Lost or diminished value of their Private Information;

b. Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information;

c. Lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges;

d. Time needed to investigate, correct and resolve unauthorized access to their accounts; time needed to deal with spam messages and e-mails received subsequent to the Data Breach;

e. Charges and fees associated with fraudulent charges on their accounts; and

f. The continued and increased risk of compromise to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

12. Plaintiff brings this action to hold Defendant accountable and to obtain damages, restitution, and injunctive and declaratory relief requiring Defendant to implement and maintain reasonable data security practices, including encryption, multi-factor authentication, regular penetration testing, and appropriate access controls, and to provide adequate credit monitoring and identity theft protection services to Plaintiff and Class Members, among other relief.

## THE PARTIES

13. Plaintiff Dorain McCowen is a citizen and resident of Las Vegas, Nevada

14. Defendant Blue Teal Holdings, LLC is a Texas limited liability company with its principal place of business located at 2525 Kell Blvd., Ste 510, Wichita Falls, TX 76308. Defendant conducts business in Wichita County, Texas.

15. Defendant, together with its network of affiliates, subsidiaries, and other entities, collected, maintained, and stored the Private Information of, at a minimum, tens of thousands of individuals, including Plaintiff and Class Members. Defendant was at all relevant times

4

responsible for protecting the confidentiality, integrity, and security of the Private Information in its possession, custody, or control.

**JURISDICTION AND VENUE**

16. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because: (a) the proposed Class consists of more than 100 members; (b) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) at least one Class Member is a citizen of a state different from Defendant.[3]

17. For purposes of assessing diversity under CAFA, an unincorporated association — including a limited liability company — is deemed a citizen of the state under whose laws it is organized and the state where it maintains its principal place of business. 28 U.S.C. § 1332(d)(10) Upon information and belief, Defendant was organized under the laws of Texas and maintains its principal place of business in 2525 Kell Blvd., Ste 510, Wichita Falls, Texas 76308. Accordingly, Defendant is a citizen of Tennessee for CAFA purposes, and minimal diversity exists because Plaintiff is a citizens of Nevada.

18. This Court has personal jurisdiction over Defendant because Defendant maintains its headquarters and principal place of business at 2525 Kell Blvd., Ste 510, Wichita Falls, TX 76308, which is within this District. Defendant conducts substantial business in this District, and the claims arise from Defendant's conduct directed at and emanating from this District.

---

[3] Indeed, Plaintiff is a citizen of Las Vegas, Nevada, and Defendant has alerted multiple attorney generals that non-texas citizens were impacted. *See, e.g.*, *Data Breach Notices*, MA. ATT'Y GEN., https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/ef9fb7bc-7d26-48bf-9395-5d9a8a062187.html (last visited June 1, 2026); *Search Data Security Breaches*, Cal. Att'y Gen., https://oag.ca.gov/privacy/databreach/list?field_sb24_org_name_value=blue+teal&field_sb24_breach_date_value%5Bmin%5D%5Bdate%5D=&field_sb24_breach_date_value%5Bmax%5D%5Bdate%5D= (last visited June 1, 2026).

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including Defendant's maintenance and storage of Plaintiff's and Class Members' Private Information at and through systems operated from this District.

**COMMON FACTUAL ALLEGATIONS**

**A.    Defendant's Collection and Storage of Private Information**

20.    Defendant is a commercial holding company with various interests in oil and gas companies in the state of Texas.

21.    In order to provide its services, Defendant collects, maintains, and stores large volumes of Private Information belonging to its clients as part of its general business operations.

22.    Upon information and belief, Defendant failed to implement necessary data security safeguards at the time of the Data Breach. This failure resulted in cybercriminals accessing Plaintiff's and Class members' Private Information.

23.    Plaintiff and Class members made their Private Information available to Defendant with the reasonable expectation that any entity with access to this information would keep that sensitive and personal information confidential and secure from illegal and unauthorized access. They similarly expected that, in the event of any unauthorized access, these entities would provide them with prompt and accurate notice.

24.    This expectation was objectively reasonable and based on an obligation imposed on Defendant by statute, regulations, industrial custom, and standards of general due care.

25.    Unfortunately for Plaintiff and Class members, Defendant failed to carry out its duty to safeguard sensitive Private Information and provide adequate data security. As a result, it

failed to protect Plaintiff and Class members from having their Private Information accessed and stolen during the Data Breach.

**B.     The Data Breach**

26.     Upon information and belief, on or around October 13, 2025, Defendant detected unusual activity on its computer networks.[4]

27.     Upon information and belief, an unauthorized party gained unauthorized access to Defendant's systems.[5]

28.     Upon information and belief, Plaintiff's and Class Members' Private Information, including their names and Social Security numbers, were accessed and exfiltrated in the Data Breach.[6]

29.     Indeed, Defendant reported to the Texas Attorney General compromised data includes: Names of individual; Social Security Number Information; Driver's License number; Government-issued ID number (e.g. passport, state ID card); and Financial Information (e.g. account number, credit or debit card number).[7]

30.     This was not merely unauthorized viewing of data; it was active exfiltration—the unauthorized copying and removal of data from Defendant's possession to a location controlled by the unauthorized actor.

---

[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Data Secuirty Breach Reports*, TEX. ATT'Y GEN., https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited June 1, 2026). *Id.* As Defendant's notice indicates, the compromised data varies by individual but includes various iterations of the data listed herein.

31. Defendant sent individuals a letter to notify them of the Data Breach on or around May 28, 2026 ("Notice Letter").[8]

32. Although the Data Breach took place in October 2025, Defendant waited approximately seven months to issue the Notice Letter.[9]

33. Omitted from the Notice Letter was the identity of the cybercriminals who perpetrated this Data Breach, the length of the Data Breach, details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again.

34. This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

35. Despite Defendant's intentional opacity about the root cause of this incident, several facts may be gleaned from the Notice Letter, including (a) that this Data Breach was the work of cybercriminals; (b) that the cybercriminals first infiltrated Defendant's networks and systems, and downloaded data from the networks and systems (a.k.a. exfiltrated data, or in layperson's terms, "stole" data); and (c) that once inside Defendant's network and systems, the cybercriminals targeted information including Plaintiff's and Class Members' Private Information.

36. Defendant's prolonged investigation and response time, in addition to the *modus operandi* to use a double-extortion model,[10] strongly suggests either (i) Defenadnt only discovered

---

[8] *Id.*

[9] *Id.*

[10] #*Stop Ransomware Guide*, CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last visited June 1, 2026).

the Data Breach upon delivery of a ransom note after the cybercriminals completed most of its attack, or (ii) Defendant discovered the attack prior to the ransom note, but could not prevent cybercriminals from accessing and exfiltrating Private Information stored on Defendant's network.

37. Given that the hackers were able to infiltrate Defendant information systems for an extended period of time and perform malicious activity—including reconnaissance and data exfiltration functions that should have had alarm bells ringing—it is likely that Defendant failed to implement reasonable industry standard cybersecurity safeguards sufficient to detect malicious activity in a timely manner, including monitoring, logging, and alerting systems such as EDR, XDR, data loss prevention tools, and centralized alerting and logging.

38. In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to Plaintiff's and Class Members' Private Information.

39. Given Defendant's failure in even the most basic requirements of cybersecurity, it is likely that Defendant's cybersecurity program as a whole is severely inadequate in comparison to the measures it is legally obligated to provide to individuals for whom it collects Personal Information, thus leaving them exposed to the Data Breach that indeed came into fruition.

C.    **The Data Breach Was a Foreseeable Risk of Which Defendant Was on Notice**

40. Plaintiff and Class Members value their Private Information, as in today's electronic-centric world, their Private Information is required for numerous activities, such as new registrations to websites, or opening a new bank account, as well as signing up for special deals.

41. In light of recent high profile data breaches, Defendant knew or should have known that their electronic records would be targeted by cybercriminals.

9

42.     In 2024, there were 3,158 data breaches with 1,350,835,988 victim notices, a 211% increase year over year. [11]

43.     In April 2020, ZDNet reported, in an article tilted "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporation information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[12]

44.     In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion." [13]

45.     Defendant's data security obligations were also particularly important given the of the value of its collected and stored data.

46.     Further, as data breaches become ever more prevalent and as technology advances, computer programs can scan the internet to create a mosaic of information that could be used to link compromised information to an individual in ways in a phenomenon known as the "mosaic effect." By and through this process, names, dates of birth, and contact information such as telephone numbers and email addresses, hackers and identity thieves can access users' other

---

[11]  2024 DATA BREACH REPORT 6, IDENTITY THEFT RES. CTR. (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[12] Catalin Cimpanu, *Ransomware Mentioned in 1,000+ SEC Filings Over the Past Year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.
[13] *Stop Ransomware Guide*, CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last visited June 1, 2026).

accounts by, for example, bypassing security questions and 2FA security with the comprehensive collection of information at their disposal.

47.     Thus, because of this effect, cybercriminals and other unauthorized parties could use Plaintiff's and Class Members' Private Information to access, inter alia, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members, even when that specific category of information is not compromised in a given breach.

48.     A particularly trouble example of this effect is the development of "Fullz" packages. A "Fullz" packages is a dosser of information that cybercriminals and other unauthorized parties can assemble by cross-referencing the Private Information compromised in a given data breach to publicly available data or data compromised in other data breaches. Automated programs can and are routinely used to create these dossiers and they typically represent an alarmingly accurate and complete profile of a given individual.

49.     This readily available and accessible information confirms that, prior to the Data breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included threatening to release stolen data.

50.     Defendant should have been aware, and indeed was aware, that it was at risk of a data breach that could expose the Private Information that it solicited, collected, stored, and maintained, especially given the rise of data breaches.

51.     Defendant was aware, or should have been aware, of the risks and harm that could result from inadequate data security.

52.     Defendant failed to implement adequate security measures to safeguard the Private Information of Plaintiff and Class Members.

**D.     Defendant's Inadequate Data Security Practices**

53.     Defendant was required by law and industry standards to implement and maintain reasonable data security measures to protect the Private Information in its possession.

54.     Upon information and belief, Defendant failed to implement and maintain reasonable and adequate security measures to protect Plaintiff and Class Members' Private Information from unauthorized access and exfiltration. Specifically, and upon information and belief, Defendant's failures include but are not limited to one or more of the following: failure to implement or enforce adequate access controls, including multi-factor authentication; failure to conduct regular and adequate risk assessments; failure to implement adequate intrusion detection and prevention systems; failure to adequately monitor its network for unauthorized access; failure to maintain adequate logging and auditing capabilities; failure to train employees on cybersecurity best practices; failure to patch known vulnerabilities in a timely manner; failure to properly monitor third-party data security systems for existing intrusions, brute-force attempts, and clearing of event logs; failure to ensure that employees and third-party vendors practice the principle of least-privilege and maintain credential hygiene; failure to avoid the use of domain-wide, admin-level service accounts; failure to ensure that employees and third-party vendors employ or enforce the use of strong, randomized, just-in-time local administrator passwords; failure to adequately oversee third-party vendors with access to Private Information; and/or failure to implement reasonable data retention and disposal policies. The specific security failures will be further detailed through discovery.

55.     Defendant knew or should have known of the risks inherent in collecting and storing large volumes of PII, and of the specific, foreseeable risk that failure to adequately secure such data would result in unauthorized access, exfiltration, and harm to the individuals whose data it held. Defendant was on notice that it was a target for cyberattacks by virtue of the volume and sensitivity of the data it maintained.

56.     Federal and state governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[14]

57.     Among other things, FTC guidelines provide that businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[15] The FTC further recommends that companies limit access to sensitive data; require complex passwords to be used on networks;

---

[14] *See* FED. TRADE COMMISSION, *Start With Security* (June 2015), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited June 1, 2026).
[15] *See Federal Trade Commission, Protecting Personal Information: A Guide for Business (rev. Oct. 2016),* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited June 1, 2026).

use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

58.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect personally identifiable information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations. Upon information and belief, Defendant failed to comply with the data security standards established by the FTC's guidance and enforcement actions.

59.     To prevent and detect unauthorized cyber-attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with at least privilege in mind. If a user only needs to read specific files, the user should not have written access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[16]

60.    To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks . . . .

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the Internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net) . . . .

---

[16] HOW TO PROTECT YOUR NETWORKS FROM RANSOMWARE 3–4, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (U.S. Government Interagency technical guidance document)(last visited June 1, 2026).

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it . . . .

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic . . . .[17]

61.     To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-facing assets**
- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**
- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**
- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**
- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

---

[17] *Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SEC. AGENCY (April 11, 2019), https://www.cisa.gov/news-events/news/protecting-against-ransomware (revised Sept. 2, 2021).

**Apply principle of least-privilege**
- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**
- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[18]

62.    Given that Defendant was storing the Private Information of Plaintiff and Class Members, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks. However, Defendant failed to do so.

63.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

64.    The foregoing frameworks are existing and applicable industry standards in the industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

---

[18] *Human-Operated Ransomware Attacks: A Preventable Disaster*, MICROSOFT THREAT INTELLIGENCE (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster.

**E.      Common Class Members' Injuries**

65.     As a direct and proximate result of the Data Breach and Defendant's failures, Plaintiff and Class Members have suffered and will continue to suffer actual, concrete injuries, including but not limited to the following:

a)      The unauthorized exfiltration and exposure of their Private Information to criminal third parties, which constitutes a concrete, de facto injury in and of itself;

b)      A substantially heightened and imminent risk of identity theft, medical identity fraud, insurance fraud, phishing, and other criminal misuse of their Private Information, which risk is not speculative but is established by the confirmed exfiltration of data by an unauthorized actor;

c)      Loss of the value of the privacy and confidentiality of their Private Information;

d)      Actual out-of-pocket expenses and time spent monitoring financial accounts and credit reports for evidence of fraud or misuse;

e)      Actual out-of-pocket expenses and time spent investigating the Data Breach, reviewing the breach notification, and taking responsive protective measures;

f)      The cost of credit monitoring, identity theft protection, and other mitigation services;

g)      Loss of the benefit of the bargain and overpayment for services/products that were implicitly represented to include reasonable data security protections;

h)      Diminution in the value of their Private Information;

i)      Anxiety, emotional distress, and mental anguish arising from the knowledge that their sensitive medical and personal information has been exfiltrated by an unauthorized actor and may be used against them at any time; and

j)      The continuing risk to their Private Information, which remains in Defendant's possession and may be subject to further breaches, absent adequate remedial measures.

66.      Defendant's conduct, as described herein, has caused real, immediate, and continuing harm to Plaintiff and Class Members. Even for those individuals who have not yet experienced actual identity theft or fraud, the confirmed exfiltration of their Private Information to a criminal actor establishes a concrete and imminent injury that is not speculative. Where, as here, data has been actually obtained by an unauthorized third party, affected individuals are injured by the sufficiently imminent risk of future harm alone.

67.      Data security is a primary concern for consumers. According to a survey conducted by cybersecurity firm FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important factor in purchasing decisions, and nearly the same percentage would pay more to work with a provider that maintains better data security. Seventy percent of consumers would provide less personal information to organizations that have suffered a data breach. These findings underscore the concrete economic value that Plaintiff and Class Members placed on the implicit promise that Defendant would safeguard their Private Information.[19]

### The Data Breach Caused Plaintiff and the Class Increased Risk of Identity Theft

68.      The Data Breach has placed Plaintiff and the proposed Class Members at an increased risk of fraud and identity theft.

---

[19] *See* FIREEYE, INC., *Beyond the Bottom Line: The Real Cost of Data Breaches* (2016), *available at* https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html (last visited June 1, 2026).

69.     Plaintiff and Class Members are at a heightened risk of identity theft for years to come, especially because Defendant's failures resulted in Plaintiff's and Class Members' Private Information falling into the hands of identity thieves.

70.     The unencrypted Private Information of Class Members has already or will end up for sale on the dark web because that is the *modus operandi* of hackers. Indeed, when these criminals do not post the data to the dark web, it is usually at least sold on private Telegram channels to identity thieves who purchase the Private Information for the express purpose of conducting financial fraud and identity theft operations.

71.     The FTC warns the public to pay particular attention to how they keep personally identifying information including Social Security numbers and other sensitive data. As the FTC notes, "once identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[20]

72.     The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, Private Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[21] Experian reports

---

[20]*Warning Signs of Identity Theft*, Federal Trade Comm'n, available at https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft.

[21] Anita George, *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs.

that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[22] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[23]

73.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.

74.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information…[is] worth more than 10x on the black market."[24]

75.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

76.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the cybercriminal to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

77.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to

---

[22] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web.

[23] *For Sale in the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark (last visited June 1, 2026).

[24] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10X Price of Stolen Credit Card Numbers*, NETWORKWORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

78.    Further, the standard operating procedure for cybercriminals is to use some data, like the Private Information here, to access "Fullz packages" of that person to gain access to the full suite of additional Private Information that those cybercriminals have access through other means. Using this technique, identity thieves piece together full pictures of victims' information to perpetrate even more types of attacks.

79.    With "Fullz" packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

80.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

81.    Further, using this technique, identity thieves piece together full pictures of victims' information to perpetrate even more types of attacks.

82.    There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victim's names; victim's

22

losing health care benefits (medical identity theft); hackers taking over email and other accounts; time and effort to repair credit scores; losing home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the Dark Web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.

83.    Individuals, like Plaintiff and Class Members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing your DNA for hackers' purposes.

84.    According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases."[25] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[26]

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never

---

[25]    *See    Avoid    Identity    Theft*, SOC. SEC. ADMIN., https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20 and%20use,and%20other%20private%20information%20increases (last visited June 1, 2026).
[26] *Id.*

bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[27]

85.    In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[28] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[29]

86.    Identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's Private Information to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

87.    Such fraud may go undetected until debt collection calls commence months, or even years later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

88.    Data Breach victims suffer long-term consequences when their social security numbers are taken and used by hackers. Even if they know their social security numbers are being

---

[27] *Identity Theft and Your Social Security Number*, Soc. Sec. Admin. (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[28] *See How to Protect Yourself from Social Security Number Identity Theft*, Equifax, https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/ (last visited June 1, 2026).
[29] *See* Julia Kagan, *What is a SSN? What to Know About Social Security Numbers*, Investopedia (Sept. 2, 2024) https://www.investopedia.com/terms/s/ssn.asp.

misused, Plaintiff and Class Members cannot obtain new numbers unless they become a victim of social security number misuse.

89.     It is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

90.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[30]

91.     Similarly, the Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other PII, such as your name and address, remains the same."[31]

92.     The California state government warns that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement

---

[30] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.
    [31] *Identity Theft and Your Social Security Number*, Pub. No. 05-10064, SOCIAL SEC. ADMIN. (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[32]

93.    Moreover, A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web.  On its own, a forged license can sell for around $200."[33]

94.    According to the national credit bureau Experian:

A driver's license is an identity thief's paradise. With that one card, someone knows your birthdate, address, and even your height, eye color, and signature. If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you. Next to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves.

95.    According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[34] However, this is not the case.  As cybersecurity experts point out:

"It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification or use the information to craft curated social engineering phishing attacks."[35]

---

[32] *See Your Social Security Number: Controlling the Key to Identity Theft*, CAL. DEPT. JUST. https://oag.ca.gov/idtheft/facts/your-ssn (last visited June 1, 2026).
[33] *Id.*
[34] Scott Ikeda, *Geico Data Breach Leaks Driver's License Numbers, Advises Customers to Watch Out for Fraudulent Unemployment Claims*, CPO MAG. (Apr. 23, 2021), https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/.
[35] *Id.*

26

96.     Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[36]

97.     The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[37]

98.     Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls. For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. Moreover, thirty-three percent reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage. Fifty-four percent reported feelings of being violated.[38]

99.     What is more, theft of Private Information is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, pieces of Private Information are valuable property rights.

---

[36] *How Identity Thieves Took My Wife for a Ride*, N.Y. TIMES (April 27, 2021), https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html.

[37] *What To Do Right Away*, FTC (2024), https://www.identitytheft.gov/Steps.

[38] *The Identity Theft Resource Center's 2021 Consumer Aftermath Report Reveals Impacts on Covid-19 Identity Crime Victims*, IDENTITY THEFT RES. CTR. (May, 26, 2021), https://www.idtheftcenter.org/post/the-identity-theft-resource-centers-2021-consumer-aftermath-report-reveals-impacts-on-covid-19-identity-crime-victims/.

100. Pieces of Private Information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

101. There is a strong probability that entire batches of stolen information have been or will be dumped on the black market , meaning Plaintiff and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

102. Further, there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[39]

103. Thus, Plaintiff and the Class Members must vigilantly monitor their financial and credit accounts for many years to come.

104. Accordingly, the Data Breach has caused Plaintiff and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein.

105. Defendant knew or should have known of these harms which would be caused by the Data Breach it permitted to occur and strengthened its data systems accordingly.

---

[39] *See* GAO Report, at p. 29.

*Loss of time to Mitigate Risk of Identity Theft and Fraud*

106.    Because of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm and potential legal defenses.

107.    According to a Presidential Report on identity theft, individual victims often suffer indirect financial costs, including costs incurred in civil litigation initiated by creditors and in overcoming obstacles to obtaining or retaining credit. Victims of non-financial identity theft, including health-related fraud, face distinct harms and frustrations. The United States Department of Justice's Bureau of Justice Statistics has found that identity theft victims reported spending an average of seven hours resolving issues related to identity theft or fraud.[40]

108.    By spending this time, Plaintiff was not manufacturing their own harm but were taking necessary steps at Defendant's direction. Indeed, Defendant's own Notice, "encourages individuals to remain vigilant by reviewing account statements and Explanation of Benefits forms for suspicious activity" due to the Data Breach.[41]

109.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing

---

[40] *See* Erika Harrell, *Victims of Identity Theft, 2014*, Bureau of Justice Statistics, U.S. DEPARTMENT OF JUSTICE (Sept. 2015), *available at* https://bjs.ojp.gov/library/publications/victims-identity-theft-2014 (last visited June 1, 2026).
[41] *See* n. 1 *supra*.

passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

110. These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to her good name and credit record."[42]

### *The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary*

111. Based on the value of the information stolen, the data either has or will be sold to cybercriminals whose mission is to perpetrate identity theft and fraud. Even if the data is not posted online, these data are ordinarily sold and transferred through private Telegram channels wherein thousands of cybercriminals participate in a market for such data so that they can misuse it and earn money from financial fraud and identity theft of data breach victims.

112. Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

113. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of seven years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

---

[42] *See* GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. GOV'T OFFICE, (June 2007), https://www.gao.gov/new.items/d07737.pdf.

### *Diminution in Value of Private Information*

114.    PII are valuable property rights.[43] Their value is axiomatic, considering the value of Big Data in corporate America and that cyber theft convictions include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond doubt that Private Information has considerable market value.

115.    An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[44]

116.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[45]

117.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[46]

118.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an

---

[43] *See, e.g.*, Randall T. Soma *et al.*, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[44] David Lazarus, *Shadowy Data Brokers Make the Most of Their Invisibility Cloak*, L.A. TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[45] *See e.g.*, https://datacoup.com/ (last visited June 1, 2026).

[46] *Frequently Asked Questions*, NIELSON COMPUT. & MOBIL PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited June 1, 2026).

economic loss. Moreover, Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

119.   Additionally, Plaintiff and Class Members further seek to recover the value of the unauthorized access to their Private Information caused by Defendant's wrongful conduct. This measure of damages is analogous to remedies for the unauthorized use of intellectual property. Like technology protected by a trade secret, a person's Private Information is non-rivalrous — the unauthorized use by a third party does not diminish the owner's own ability to use such information, yet the owner may recover the reasonable value of its use, i.e., a "reasonable royalty," from the unauthorized user. A similar royalty or license measure of damages is appropriate here because: (a) Plaintiff and Class Members have a protectible property interest in their Private Information; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, including evidence regarding the price at which similar data is transacted on both legitimate and illegitimate markets.

### Lost Benefit of the Bargain

120.   Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to provide Defendant with their Private Information under certain terms, Plaintiff and Class Members understood and expected that Defendant would properly safeguard and protect their Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services and/or employment of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

**PLAINTIFF'S MCCOWIN EXPERIENCES AND INJURIES**

121.    At all times relevant, Defendant maintained Plaintiff's Private Information on its systems.

122.    Plaintiff received the Notice letter, by U.S. mail, directly from Defendant, which was dated May 28, 2026. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties including his name, and Social Security Number.

123.    Plaintiff is very careful about sharing his sensitive PII. Plaintiff stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted his PII to Defendant or one of its subsidiaries or affiliates had he known of Defendant's lax data security policies.

124.    Plaintiff is unaware of how Defendant came into possession of his PII, but upon information and belief, upon information and belief provided his PII to a subsidiary or affiliated entity of Defendant.[47]

125.    As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, as well as reviewing credit reports and financial account statements. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

---

[47] Indeed, the Notice Letter suggests that Defendant acquired his information through Plaintiff's "current or previous relationship with one of Blue Teal Holdings' affiliates, subsidiaries, or other entities." Ex. A.

126.    Plaintiff suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (i) misuse of Private Information; (ii) spam calls and communications; (iii) invasion of privacy; (iv) theft of his PII; (v) lost or diminished value of PII; (vi) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) loss of benefit of the bargain; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

## CLASS ALLEGATIONS

127.    Plaintiff brings this class action, individually and on behalf of the following Class under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3):

**Nationwide Class**
All persons in the United States whose Private Information was compromised as a result of the Data Breach (the "Nationwide Class").

128.    Specifically excluded from the Class are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

129.    Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

130.    This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

131.    <u>Numerosity</u>: The Class is so numerous that joinder of all Class Members is impracticable. Although the precise number of such persons is unknown, and the facts are presently within the sole knowledge of Defendant, upon information and belief, Plaintiff estimates that the Class is comprised of likely over a hundred thousand members.[48] The Class is sufficiently numerous to warrant certification.

132.    <u>Typicality of Claims</u>: Plaintiff's claims are typical of those of other Class Members because Plaintiff, like the unnamed Class, had his Private Information compromised because of the Data Breach. Plaintiff is members of the Class, and their claims are typical of the claims of the members of the Class. The harms suffered by Plaintiff are similar to that suffered by all other Class Members which was caused by the same misconduct by Defendant.

133.    <u>Adequacy of Representation</u>: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has no interests antagonistic to, or in conflict with, the Class. Plaintiff has retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

134.    <u>Superiority</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

---

[48] *See, e.g.*, *Data Security Breach Reports*, TEX. ATT'Y GEN., https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited June 1, 2026).

135.    <u>Commonality and Predominance</u>: Defendant engaged in a common course of conduct toward Plaintiff and Class Members, in that Plaintiff's and Class Members' Private Information was stored on the same network and unlawfully accessed in the same way. There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a)    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

b)    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

c)    Whether Defendant's storage of Plaintiff's and Class Members' Private Information was done in a negligent manner;

d)    Whether Defendant had a duty to protect and safeguard Plaintiff's and Class Members' Private Information;

e)    Whether Defendant's conduct was negligent;

f)    Whether Defendant's conduct violated Plaintiff's and Class Members' privacy;

g)    Whether Defendant took sufficient steps to secure individuals' Private Information;

h)    Whether Defendant was unjustly enriched; and

i)    The nature of relief, including damages and equitable relief, to which Plaintiff and Class Members are entitled.

136.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof

of a common course of conduct to which Plaintiff wasexposed are representatives of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

137.    Manageability: The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

138.    Ascertainability: Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

139.    Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

140.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**NEGLIGENCE AND NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

141.    Plaintiff re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein.

142.    Defendant knowingly solicited, collected, stored, and maintained the Private Information of Plaintiff and Class Members on inadequately secured computer systems and networks.

143.    Upon accepting and storing Plaintiff's and Class Members' Private Information on their computer systems and networks, Defendant undertook and owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information from unauthorized access and disclosure.

144.    Defendant had full knowledge of the sensitivity of the Private Information in its possession and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information was wrongfully accessed or disclosed. Plaintiff and Class Members were therefore the foreseeable victims of any inadequate data security practices.

145.    Defendant owed a duty to exercise reasonable care in designing, implementing, maintaining, monitoring, and testing its networks, systems, protocols, policies, procedures and practices to ensure that Plaintiff's and Class Members' Private Information was adequately secured from impermissible release, disclosure, and publication.

146.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its computer systems and networks, and the personnel responsible for them, adequately protected the Private Information.

38

147. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

148. Defendant owed Plaintiff and Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and the Class when obtaining, storing, using, and managing their Private Information, including taking action to reasonably safeguard or delete such data and providing notification to Plaintiff and Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

149. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards, applicable standards of care from statutory authority like Section 5 of the FTC Act and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected individuals' Private Information.

150. Defendant had a duty to implement and maintain reasonable data security practices pursuant to Section 5 of the FTC Act, 15 U.S.C. § 45(a), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect sensitive and confidential data.

151. The FTC Act prohibits "unfair practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also formed part of the basis of Defendant's duty in this regard.

152.    Defendant was in a superior position to ensure its data security practices were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

153.    Defendant knew Plaintiff and Class Members relied on them to protect their Private Information. Plaintiff and Class Members were not in a position to assess the data security practices used by Defendant. Because they had no means to identify Defendant's security deficiencies, Plaintiff and Class Members had no opportunity to safeguard their Private Information from cybercriminals. Defendant exercised control over the Private Information stored on its systems and networks; accordingly, Defendant was best positioned and most capable of preventing the harms caused by the Data Breach.

154.    Defendant's duties extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to such risk, or defeats protections put in place to guard against that risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B.

155.    Defendant was aware, or should have been aware, of the fact that cybercriminals routinely target entities storing PII through cyberattacks in an attempt to steal valuable Private Information. In other words, Defendant knew of a foreseeable risk to its data security systems but failed to implement reasonable security measures.

156.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information.

157.    The specific negligent acts and omissions committed by Defendant include, but are not limited to:

a) Failing to adopt, implement, and maintain adequate data security measures to safeguard Plaintiff's and Class Members' Private Information;

b) Failing to adequately monitor the security of its networks and systems to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information;

c) Failing to ensure its systems had plans in place to maintain reasonable data security safeguards;

d) Failing to implement and maintain adequate mitigation policies and procedures;

e) Allowing unauthorized access to Plaintiff's and Class Members' Private Information;

f) Failing to detect in a timely manner that Plaintiff's and Class Members' Private Information had been compromised; and

g) Failing to timely notify Plaintiff and Class Members about the Data Breach so they could take appropriate steps to mitigate the potential for identity theft and other damages.

158. Defendant's negligent conduct demonstrated a substantial lack of concern for whether injury would result to Plaintiff and the Class. Defendant's actions and omissions constituted a reckless indifference to the rights, safety, and interests of Plaintiff and the Class, whose sensitive personal and medical information Defendant was entrusted to protect.

159. Defendant acted negligently by ignoring its duty—in spite of its knowledge of the ubiquity of data breaches—to ensure its own network and systems had adequate security safeguards to protect Plaintiff's and Class Members' Private Information and to ensure processes were sufficient to detect unauthorized access to its network or compromises of Private Information stored therein.

160. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

161. Defendant violated the FTC Act by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information and by failing to comply with applicable industry standards, as described herein.

41

162.    Defendant breached its duties to Plaintiff and the Class under the FTC Act by failing to implement and maintain fair, reasonable, and adequate data security practices to safeguard Plaintiff's and Class Members' Private Information, and by failing to provide prompt notice of the Data Breach without unreasonable delay.

163.    Plaintiff and the Class are within the class of persons the FTC Act intended to protect.

164.    As a direct and proximate result of Defendant's negligent conduct, including, but not limited to, their knowing failure to implement and maintain reasonable data security practices and procedures as described above, Plaintiff and the Class have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

165.    Moreover, as a result of Defendant's negligence in safeguarding Plaintiff's and Class Members' Private Information, Plaintiff and Class Members will have to spend money for future costs of credit monitoring and theft protection which are reasonably necessary given the type of highly sensitive data stolen in the Breach.

166.    Through Defendant's acts and omissions described herein, including but not limited to Defendant's failure to protect the Private Information of Plaintiff and Class Members from being stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure the Private Information of Plaintiff and Class Members while it was within Defendant's possession and control.

167.    As a direct and proximate result of Defendant's conduct, including, but not limited to, Defendant's failure to implement and maintain reasonable data security practices and procedures, Plaintiff and Class Members have suffered or will suffer injury and damages, including, but not limited to: (i) the loss of the opportunity to determine for himself how their

42

Private Information is used; (ii) the publication and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information, including the need for substantial credit monitoring and identity protection services for an extended period of time; (iv) lost time and opportunity costs associated with efforts expended to address and mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from fraud and identity theft; (v) costs associated with placing freezes on credit reports and password protections; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives. Thus, Plaintiff and the Class are entitled to damages in an amount to be proven at trial.

168.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, damages arising from the Data Breach, as alleged above.

169.    The damages Plaintiff and the Class have suffered and will suffer (as alleged above) were and are the direct and proximate result of Defendant's gross negligent conduct.

170.    Plaintiff and the Class have suffered cognizable injuries and are entitled to actual and punitive damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

171.    Plaintiff re-alleges and incorporates by reference all other paragraphs as if fully set forth herein.

172.    Defendant solicited, collected, stored, and maintained Plaintiff's and Class Members' Private Information as part of Defendant's regular business practices.

173.    That is, Defendant required Plaintiff and Class Members to provide and entrust their Private Information as a mandatory condition of services from Defendant or its affiliates and subsidiaries, and Plaintiff and Class Members entrusted their Private Information to Defendant pursuant to this condition.

174.    When Plaintiff and Class Members provided their Private Information to Defendant, they entered into implied contracts with Defendant pursuant to which Defendant agreed to safeguard and protect such Private Information and to timely and accurately notify Plaintiff and Class Members if and when their Private Information was breached and compromised.

175.    In delivering, directly or indirectly, their Private Information to Defendant and paying for services, Plaintiff and Class Members intended and understood that Defendant would adequately safeguard their Private Information.

176.    Plaintiff and Defendant had a mutual understanding that Defendant would implement and maintain adequate and reasonable data security practices and procedures to protect Plaintiff's and Class Members' sensitive Private Information. Plaintiff and Defendant also shared an expectation and understanding that Defendant would not share or disclose, whether intentionally or unintentionally, the sensitive Private Information in their possession and control.

177.    Defendant promised and warranted to Plaintiff and Class Members, including through its conduct set forth *supra*, to maintain the privacy and confidentiality of the Private

44

Information it collected from them and to keep such information safeguarded against unauthorized access and disclosure.

178. A meeting of the minds occurred when Plaintiff and Class Members agreed to, and did, provide their Private Information to Defendant and agreed Defendant would receive payment for, amongst other things, the protection of their Private Information.

179. Plaintiff and Class Members performed their obligations under the contracts when they provided their Private Information to Defendant.

180. The implied promise of confidentiality includes consideration beyond those pre-existing duties owed under Section 5 of the FTC Act, and other state and federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

181. The implied promises include, but are not limited to: (i) taking steps to ensure any agents or vendors who are granted access to Private Information protect the confidentiality of that information; (ii) taking steps to ensure that Private Information in the possession and control of Defendant, its agents, and/or vendors is restricted and limited to achieve an authorized medical purpose; (iii) restricting access to qualified and trained agents and/or vendors; (iv) designing and implementing appropriate retention policies to protect the Private Information from unauthorized access and disclosure; (v) applying or requiring proper encryption of the Private Information; (vi) requiring multifactor authentication for access to the Private Information; and (vii) other steps necessary to protect against foreseeable data breaches.

182. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of such implied contracts.

183.    Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant.

184.    Defendant breached the implied contracts with Plaintiff and Class Members by failing to safeguard Plaintiff's and Class Members' Private Information and by failing to provide them with timely and accurate notice of the Data Breach.

185.    As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members have suffered damages, including foreseeable consequential damages that Defendant knew about when it solicited and collected Plaintiff's and Class Members' Private Information.

186.    At minimum, as a result of Defendant's breach of implied contract, Plaintiff and Class Members will have to spend money for future costs of credit monitoring and theft protection which are reasonably necessary given the type of highly sensitive data stolen in the Breach, including but not limited to Social Security numbers.

187.    As a result of Defendant's failures to provide the data security protections promised, Plaintiff and Class Members did not receive the full benefit of their bargains with Defendant and instead received services of a diminished value compared to that described in the implied contracts. Plaintiff and Class Members were therefore damaged in an amount at least equal to the difference in the value of the services with data security protection they paid for and that which they received.

188.    Plaintiff and the Class have suffered injuries as described above, and are entitled to actual and punitive damages, statutory damages, and reasonable attorneys' fees and costs, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**INVASION OF PRIVACY—INTRUSION UPON SECLUSION AND PUBLIC**
**DISCLOSURE OF PRIVATE FACTS**
**(On Behalf of Plaintiff and the Class)**

189.    Plaintiff re-alleges and incorporates by reference all other paragraphs as if fully set forth herein.

190.    Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

191.    Plaintiff and Class Members successfully took reasonable and appropriate steps to keep their Private Information confidential from the public.

192.    Defendant owed a duty to Plaintiff and the Class to keep this information confidential.

193.    The unauthorized acquisition (i.e., theft) by a third party of Plaintiff's and Class Members' Private Information is highly offensive to a reasonable person.

194.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class disclosed their sensitive and confidential information to Defendant, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

195.    Defendant's conduct also represents a public disclosure of private facts in that the disclosure was made to cybercriminals—individuals in a special relationship with Plaintiff and the proposed Class in that they are the exact group from whom the expected cybersecurity measures are intended to protect Plaintiff and the proposed Class.

47

196.    The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

197.    Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

198.    Defendant acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

199.    By intentionally failing to keep Plaintiff's and Class Members' Private Information safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiff's and Class Members' privacy by:

a) Intentionally and substantially intruding into Plaintiff's and Class Members' private affairs in a manner that identifies Plaintiff and Class Members and that would be highly offensive and objectionable to an ordinary person;

b) Intentionally publicizing private facts about Plaintiff and Class Members, which is highly offensive and objectionable to an ordinary person; and

c) Intentionally causing anguish or suffering to Plaintiff and Class Members.

200.    As the Restatement explains, as used throughout the Restatement of Torts, intent "has reference to the consequences of an act rather than the act itself." Restatement (Second) of Torts § 8A, cmt. A (1964). "Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from her act, and still goes ahead, she is treated by the law as if she had in fact desired to produce the result." *Id.* cmt. B.

201.    Indeed, given the foreseeability of the harms inherent in data breaches and the ubiquitous nature of data breaches, Defendant was substantially certain that its failure to implement reasonable cybersecurity standards would lead to an invasion of Plaintiff's privacy.

202.    Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

203.    As a proximate result of Defendant's acts and omissions, the Private Information of Plaintiff and the Class were stolen by a third party and is now available for disclosure and rediscloser without authorization, causing Plaintiff and the Class to suffer damages.

204.    Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class because their Private Information is still maintained by Defendant with its inadequate cybersecurity system and policies.

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

205.    Plaintiff re-alleges and incorporates by reference all other paragraphs as if fully set forth herein.

206.    Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiff and the Class.

207.    In addition to injunctive relief, Plaintiff, on behalf of himself and the other members of the Class, also seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

208. This claim is pleaded in the alternative to the breach of implied contract claim.

209. Plaintiff and Class Members conferred a benefit upon Defendant. After all, Defendant benefitted from using their PII to provide services and/or accepting payment.

210. Defendant appreciated or had knowledge of the benefits it received from Plaintiff and Class Members.

211. Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

212. Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

213. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

214. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff's and Class Members' (1) PII and/or (2) payment because Defendant failed to adequately protect their PII.

215. Plaintiff and Class Members have no adequate remedy at law.

216. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, pray for judgment as follows:

A. An Order certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing their counsel to represent the Class;

B. An order declaring that Defendant's conduct violates the laws referenced herein;

C. Judgment in favor of Plaintiff and the Class on all counts asserted herein;

D. Awards of restitution and damages in amounts to be determined at trial;

E. An award of statutory damages or penalties to the extent available;

F. Declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

G. Injunctive relief in the form of additional technical and administrative cybersecurity controls as is necessary to protect the interests of Plaintiff and the Class;

H. Injunctive relief enjoining Defendant from further deceptive practices related to data security, the Data Breach, and the transmitted Private Information;

I. An award of attorneys' fees and costs, as allowed by law;

J. An award of pre- and post-judgment interest, as provided by law; and

K. Such further relief to which Plaintiff and the Class are entitled.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated:  June 2, 2026                          Respectfully submitted,

51

*/s/ Leanna Loginov*
Leanna A. Loginov (NY 5894753)
**SHAMIS & GENTILE, P.A.**
2626 Cole Avenue, Suite 300
Dallas, TX 75204
Tel: (305) 479-2299
E: lloginov@shamisgentile.com


J. Gerard Stranch, IV (TN BPR 023045)
Grayson Wells (TN BPR 039658)
Sam Douthit (TN BPR 043065)
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com
sdouthit@stranchlaw.com

***Attorneys for Plaintiff***

52